UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

TOXICS ACTION CENTER, INC., and
ENVIRONMENT AMERICA, INC. d/b/a
ENVIRONMENT MASSACHUSETTS,

and

MARTHA BERGSTROM and KENNETH
BERGSTROM;  ELIZABETH BOURASSA and
GREG BOURASSA, individually and on behalf of
their minor child C.B.;  CHRISTIAN BOUSQUET,
individually and on behalf of his minor children E.B.
and C.B.;  BRIAN BREEN and DIANE BREEN,
individually and on behalf of their minor children
Ky.B., Ke.B., and Ka.B;  JAYME BURDETT and
CLARE BURDETT, individually and on behalf of
their minor children A.B. and M.B.;  CELESTE
CARLSON and DAVID CARLSON;
CHRISTOPHER CARPENTER and MELISSA
CARPENTER;  STEPHEN COLEMAN and LYNN
COLEMAN, individually and on behalf of their
minor children L.C. and I.C.;  LISA COURCHAINE
and DEREK COURCHAINE, individually and on
behalf of their minor child A.C.;  ERNEST
COURVILLE and THERESA COURVILLE;
TODD CUMMING and ELIZABETH CUMMING,
individually and on behalf of their minor children
C.C. and A.C.;  PAUL DAOUST and DEBRA
DAOUST, individually and on behalf of their minor
child B.D.;  WILFRID GALLIEN and WENDY
GALLIEN, individually and on behalf of their minor
children J.G. and T.G;  SARAH GERVAIS;
ROBERT JAY HOGAN and BARBARA HOGAN;
KEVIN JADIN and MELISSA JADIN;  JOHN
JORDAN and SHARON JORDAN, individually and
on behalf of their minor child C.J.;  KATHLEEN
JOY and KENNETH JOY;  DIRK LODDER and
LAURA LODDER;  JOHN MAHAN and SARAH
NEWTON, individually and on behalf of their minor
children S.M. and M.M.;  RAMONA MANCINI and
GEORGE MANCINI;  HEATHER MARIACHER;
DONNA MARSHALL and MICHAEL
MARSHALL;  STEPHEN METRAS and JOAN

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.: 4:17-cv-40089


**FIRST AMENDED COMPLAINT**
**and**
**JURY DEMAND**
**(leave to file granted on 10/25/17)**

METRAS;  JENNIFER MOBERG and SCOTT                    )
MOBERG, individually and on behalf of their minor     )
children Ju.M. and Jo.M.;  ALICE MURPHY and           )
KELLY MURPHY;  MICHAEL O'NEILL and                    )
SHALYN O'NEILL, individually and on behalf of         )
their minor children B.O. and J.O.;  JENNIFER         )
RAPOZA and JOHN RAPOZA;  KENNETH                      )
RAUKTIS and ELLEN RAUKTIS;  DARRICK                   )
ROE and SARA ROE, individually and on behalf of       )
their minor child D.R.;  CHRISTOPHER SHAW             )
and LAUREN SHAW, individually and on behalf of        )
their minor children A.S., R.S., and B.S.;            )
EDWARD SKOWRON and JOANNE SKOWRON;                    )
DANIEL STERN and CATHERINE STERN,                     )
individually and on behalf of their minor children    )
N.S. and M.S.;  KEVIN WELDON and CYNTHIA              )
WELDON;  SHERRI WESTBURY and JOSEPH                   )
WESTBURY, individually and on behalf of their         )
minor children A.W. and R.W.; and LAURIE              )
ZANCA,                                                )
                                                      )
                    Plaintiffs,                       )
                                                      )
v.                                                    )
                                                      )
CASELLA WASTE SYSTEMS, INC.,                          )
SOUTHBRIDGE RECYCLING & DISPOSAL                      )
PARK, INC., and THE TOWN OF                           )
SOUTHBRIDGE,                                          )
                                                      )
                    Defendants.                       )
_____             )

## I.  INTRODUCTION

1.     The Southbridge Recycling and Disposal Park (the "Landfill") has for many

years been releasing toxic pollutants through groundwater in Southbridge, Charlton, and

Sturbridge, Massachusetts, resulting in the widespread and increasing pollution of nearby

wetlands, waterways, drinking water aquifers, and residential wells.

2.     At present, more than eighty-five residential wells in Charlton and

Sturbridge have been contaminated by the toxic pollutants released by the Landfill, and

dozens more are at risk of contamination.  These pollutants include 1,4-dioxane, trichloroethene ("TCE"), chlorobenzene, 1,1-dichloroethane ("1,1-DCA"), 1,1-dichloroethene ("1,1-DCE"), cis-1,2-dichloroethene ("cis-1,2-DCE"), toluene, chloroform, benzene, naphthalene, lead, and arsenic.

3.     The Landfill is also polluting surrounding communities with odor and noise. Noxious fumes from the Landfill's decomposing waste befoul the air at neighboring properties, while an incessant din of heavy vehicles crashing, banging, and beeping deprives the Landfill's neighbors of the quiet enjoyment of their homes.

4.     Defendants in this action are Casella Waste Systems, Inc. ("Casella"), and its wholly owned subsidiary Southbridge Recycling & Disposal Park, Inc. ("SRDP"), the operators of the Landfill; and the Town of Southbridge ("Town"), which owns and formerly operated the Landfill.

5.     This action is brought by two sets of Plaintiffs: (a) Two non-profit environmental organizations, Toxics Action Center, Inc. ("Toxics Action") and Environment America, Inc. d/b/a Environment Massachusetts ("Environment Massachusetts") (collectively, the "Group Plaintiffs"); and (b) Ninety-nine individuals who reside or recently resided near the Landfill in Charlton (the "Individual Plaintiffs").

6.     Plaintiffs bring this action under the citizen suit provisions of two federal environmental statutes, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*. ("Clean Water Act," or "CWA").  The RCRA claim, which is brought both by the Group Plaintiffs and the Individual Plaintiffs, alleges that Defendants have contributed and are contributing to an imminent and substantial endangerment to human health and the

environment within the meaning of Section 7002(a)(1)(B) of RCRA, 42 U.S.C.

§ 6972(a)(1)(B).  The CWA claim, brought solely by the Group Plaintiffs, alleges that

Defendants are discharging pollutants to waters of the United States without National

Pollutant Discharge Elimination System ("NPDES") Permit authorization, in violation of

Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342.

7.    In addition to their RCRA claim, the Individual Plaintiffs bring several

supplemental state law claims:  a statutory claim under the Massachusetts Oil and

Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E ("c. 21E"), and

common law claims of nuisance, trespass, and unjust enrichment.  The common law

claims are based on Defendants' pollution of groundwater and on Defendants' odor and

noise pollution of the Individual Plaintiffs' properties.

8.    As relief in this action, Plaintiffs seek, *inter alia*, an order enjoining

Defendants' unlawful pollution of the waters of the United States and mandating the

remediation thereof; an assessment of civil penalties against Defendants under the Clean

Water Act; an order directing Defendants to take all necessary measures to cease the

Landfill's pollution of groundwater and to eliminate the threat posed to area residents by

the Landfill's pollution of groundwater; an award of money damages to compensate the

Individual Plaintiffs for the damage that Defendants' air, noise, and groundwater

pollution has done to them and their properties; a disgorgement of the financial benefits

enjoyed by Defendants because of their failure to invest in adequate air and noise

pollution controls; an order directing Defendants to adequately control their air and noise

pollution; and an award of Plaintiffs' litigation costs, including reasonable attorney and

expert witness fees.

## II.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 33

U.S.C. § 1365(a)(1) (the CWA citizen suit provision), 42 U.S.C. § 6972(a)(1)(B)

(RCRA's citizen suit provision), 28 U.S.C. § 1331 (federal question jurisdiction), and 28

U.S.C. § 1367(a) (supplemental jurisdiction).

10.     Venue lies in this District under 33 U.S.C. § 1365(c)(1) and 42 U.S.C.

§ 6972(a), because the Landfill is located within this District.

11.     This action is properly filed in the Central Division of the District of

Massachusetts because the Landfill is located within the Central Division.

12.     Pursuant to Section 505(b) of the CWA, 33 U.S.C. § 1365(b), and Section

7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A), the Group Plaintiffs gave notice of

the CWA violations and RCRA claim alleged herein more than 90 days prior to the

commencement of this lawsuit to: (a) the Defendants; (b) the United States

Environmental Protection Agency ("EPA"); and (c) the Massachusetts Department of

Environmental Protection ("DEP").  See Exhibit 1 (Group Plaintiffs' Notice Letter).

13.     Pursuant to Section 7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A), the

Individual Plaintiffs gave notice of the RCRA claim alleged herein more than 90 days

prior to the commencement of this lawsuit to: (a) the Defendants; (b) EPA; and (c) DEP.

See Exhibit 2 (Individual Plaintiffs' Notice Letter to Casella/SRDP) and Exhibit 3

(Individual Plaintiffs' Notice Letter to Town).

14.     Pursuant to the Massachusetts Tort Claims Act, M.G.L. c. 258, § 4, the

Individual Plaintiffs gave notice of the Massachusetts tort claims alleged herein to the

Town more than six months prior to the commencement of this lawsuit.  See Exhibit 3.

15.   Neither EPA nor the Commonwealth of Massachusetts has commenced a civil action or administrative action regarding any of the CWA violations alleged herein.

16.   Neither EPA nor the Commonwealth of Massachusetts has commenced an action against Defendants under 42 U.S.C. § 6973 or 42 U.S.C. § 9606.

17.   Neither EPA nor the Commonwealth of Massachusetts is engaging in a removal action under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604, has incurred costs to initiate a Remedial Investigation and Feasibility Study under that provision, is diligently proceeding with a remedial action under CERCLA, or has obtained a court order or issued an administrative order under 42 U.S.C. § 9606 or 42 U.S.C. § 6973, with regard to the Landfill or its contamination of groundwater or residential wells.

### III.  PARTIES

#### A.  Group Plaintiffs

18.   Plaintiff Toxics Action is a non-profit corporation duly organized under the laws of Massachusetts.  Toxics Action has approximately 1,460 members.  Toxics Action works with communities across New England to clean up pollution at the local level.

19.   Plaintiff Environment America, Inc., is a non-profit corporation duly organized under the laws of Colorado.  Environment America, Inc., is a citizen-funded environmental advocacy organization that engages in education, research, lobbying, litigation, and citizen organizing to promote clean air, clean water, and the preservation of natural resources.  Environment America, Inc., operates in Massachusetts as Environment Massachusetts, which is a citizen-based advocacy project focused on environmental concerns in Massachusetts.

20.   Pursuant to M.G.L. c. 100, § 5, Environment America, Inc., has filed a Business Certificate with the City of Boston indicating that it does business under the title of Environment Massachusetts.

21.   Environment Massachusetts has approximately 15,000 members.

### B.  Individual Plaintiffs

22.   The Individual Plaintiffs either reside or recently have resided at thirty-six homes in Charlton near the Landfill (the "Individual Plaintiff Households").  These homes are situated on four roads located around the northern end of the Landfill:  H Foote Road, Eleanor Lane, Berry Corner Road, and No. Ten Schoolhouse Road.

23.   The Individual Plaintiffs have each been damaged, and continue to be damaged, by a combination of Defendants' groundwater, odor, and noise pollution.

24.   Each of the Individual Plaintiff Households has a well from which it draws its water supply.  The Individual Plaintiffs are adversely affected by the Landfill's groundwater pollution because (a) their well has been contaminated, as set forth in the paragraphs below, or (b) their well is threatened with such contamination, given its proximity to the Landfill, to contaminated aquifers, and to the contaminated wells.

25.   In addition to the contamination or threatened contamination of their wells, the Individual Plaintiffs are adversely affected by the Landfill's pollution of groundwater because their environment is being degraded.

26.   Plaintiffs Martha and Kenneth Bergstrom reside at their property at 75 H Foote Road in Charlton.  Their well has been contaminated with TCE, 1,1-DCE, 1,1-DCA, cis-1,2-DCE, chlorobenzene, chloroform, 1,4-dioxane, and arsenic from the Landfill.

27.    Plaintiffs Elizabeth and Greg Bourassa and their minor child C.B. reside at their property at 10 Eleanor Lane in Charlton.  Their well has been contaminated with lead and arsenic from the Landfill.

28.    Plaintiffs Christian Bousquet and his minor children E.B. and C.B. reside at their property at 19 Eleanor Lane in Charlton.  Their well has been contaminated with toluene, chloroform, lead, and arsenic from the Landfill.

29.    Plaintiffs Brian and Diane Breen and their minor children Ky.B., Ke.B., and Ka.B. reside at their property at 82 H Foote Road in Charlton.  Their well has been contaminated with chloroform from the Landfill.

30.    Plaintiffs Jayme and Clare Burdett and their minor children A.B. and M.B. reside at their property at 34 H Foote Road in Charlton.  Their well has been contaminated with toluene from the Landfill.

31.    Plaintiffs Celeste and David Carlson reside at their property at 77 H Foote Road in Charlton. Their well has been contaminated with TCE, 1,1-DCE, 1,1-DCA, cis-1,2-DCE, chlorobenzene, chloroform, 1,4-dioxane, arsenic, and lead from the Landfill.

32.    Plaintiffs Christopher and Melissa Carpenter reside at their property at 66 No. Ten Schoolhouse Road in Charlton.

33.     Plaintiffs Stephen and Lynn Coleman and their minor children L.C. and I.C. reside at their property at 150 Berry Corner Road in Charlton.  Their well has been contaminated with lead and arsenic from the Landfill.

34.    Plaintiffs Lisa and Derek Courchaine and their minor child A.C. reside at 13 Eleanor Lane in Charlton.  Their well has been contaminated with 1,4-dioxane and chloroform from the Landfill.

35. Plaintiffs Ernest and Theresa Courville reside at their property at 65 No. Ten Schoolhouse Road in Charlton.

36. Plaintiffs Todd and Elizabeth Cumming and their minor children C.C. and A.C. reside at their property at 21 Eleanor Lane in Charlton. Their well has been contaminated with 1,4-dioxane and arsenic from the Landfill.

37. Plaintiffs Paul and Debra Daoust and their minor child B.D. reside at their property at 49 H Foote Road in Charlton.

38. Plaintiffs Wilfrid and Wendy Gallien and their minor children J.G. and T.G. reside at their property at 74 H Foote Road in Charlton. Their well has been contaminated with 1,4-dioxane and lead from the Landfill.

39. Plaintiff Sarah Gervais recently moved to 121 S. Orange Street in Carlisle, PA. Until July of 2017, she resided at her property at 161 Berry Corner Road in Charlton. Her well at 161 Berry Corner Road has been contaminated with lead, arsenic, 1,4-dioxane, and chloroform from the Landfill.

40. Plaintiffs Robert Hogan and Barbara Hogan reside at their property at 95 H Foote Road in Charlton. Their well has been contaminated with 1,4-dioxane, chloroform, and arsenic from the Landfill.

41. Plaintiffs Kevin and Melissa Jadin recently moved to 82 Pumpkin Lane in Charlton. Until September of 2016, they resided at their property at 185 Berry Corner Road in Charlton.

42. Plaintiffs John and Sharon Jordan and their minor child C.J. reside at their property at 68 H Foote Road in Charlton. Their well has been contaminated with arsenic and 1,4-dioxane from the Landfill.

43.    Plaintiffs Kathleen and Kenneth Joy reside at their property at 135 Berry Corner Road in Charlton.  Their well has been contaminated with arsenic from the Landfill.

44.    Plaintiffs Dirk and Laura Lodder reside at their property at 148 Berry Corner Road in Charlton.  Their well has been contaminated with lead, arsenic, and 1,4-dioxane from the Landfill.

45.    Plaintiffs John Mahan, Sarah Newton, and their minor children S.M. and M.M. reside at their property at 54 H Foote Road in Charlton.  Their well has been contaminated with TCE, 1,1-DCE, 1,1-DCA, cis-1,2-DCE, chlorobenzene, chloroform, and toluene from the Landfill.

46.    Plaintiffs Ramona and George Mancini reside at their property at 11 Eleanor Lane in Charlton.  Their well has been contaminated with 1,4-dioxane, chloroform, and arsenic from the Landfill.

47.    Plaintiff Heather Mariacher resides at her property at 149 Berry Corner Road in Charlton.  Her well has been contaminated with lead and 1,4-dioxane from the Landfill.

48.    Plaintiffs Donna and Michael Marshall reside at their property at 59 H Foote Road in Charlton.  Their well has been contaminated with toluene from the Landfill.

49.    Plaintiffs Stephen and Joan Metras reside at their property at 73 H Foote Road in Charlton.  Their well has been contaminated with chloroform and 1,4-dioxane from the Landfill.

50.    Plaintiffs Jennifer and Scott Moberg and their minor children Ju.M. and Jo.M. reside at their property at 94 H Foote Road in Charlton.  Their well has been contaminated with chloroform from the Landfill.

51.    Plaintiffs Alice and Kelly Murphy recently moved to 14 Thayer Pond, Unit 11, North Oxford, MA.  Until early 2017, they resided at their property at 14 Eleanor Lane in Charlton.  Their well at 14 Eleanor Lane has been contaminated with chloroform from the Landfill.

52.    Plaintiffs Michael and Shalyn O'Neill and their minor children B.O. and J.O. reside at their property at 18 Eleanor Lane in Charlton.  Their well has been contaminated with toluene, chloroform, and chlorobenzene from the Landfill.

53.    Plaintiffs Jennifer and John Rapoza reside at their property at 17 Eleanor Lane in Charlton.  Their well has been contaminated with chloroform from the Landfill.

54.    Plaintiffs Kenneth and Ellen Rauktis reside at their property at 98 H Foote Road in Charlton.  Their well has been contaminated with arsenic from the Landfill.

55.    Plaintiffs Darrick and Sara Roe and their minor child D.R. reside at their property at 70 H Foote Road in Charlton.  Their well has been contaminated with 1,4-dioxane from the Landfill.

56.    Plaintiffs Christopher and Lauren Shaw and their minor children A.S., R.S., and B.S. reside at their property at 58 H Foote Road in Charlton.  Their well has been contaminated with TCE, 1,1-DCE, 1,1-DCA, cis-1,2-DCE, chlorobenzene, chloroform, toluene, and 1,4-dioxane from the Landfill.

57.    Plaintiffs Edward and Joanne Skowron reside at their property at 117 Berry Corner Road in Charlton.

58.     Plaintiffs Daniel and Catherine Stern and their minor children N.S. and M.S. reside at their property at 5 Eleanor Lane in Charlton.  Their well has been contaminated with 1,4-dioxane, lead, and arsenic from the Landfill.

59.     Plaintiffs Kevin and Cynthia Weldon reside at their property at 66 H Foote Road in Charlton.  Their well has been contaminated with TCE, 1,1-DCE, 1,1-DCA, cis-1,2-DCE, chlorobenzene, 1,4-dioxane, naphthalene, and arsenic from the Landfill.

60.     Plaintiffs Sherri and Joseph Westbury and their minor children A.W. and R.W. recently moved to 34 Jennings Road in Charlton.  Until August of 2017, they resided at their property at 181 Berry Corner Road in Charlton.  Their well at 181 Berry Corner Road has been contaminated with 1,4-dioxane from the Landfill.

61.     Plaintiff Laurie Zanca resides at her property at 86 H Foote Road in Charlton.  Her well has been contaminated with 1,4-dioxane, toluene, and chloroform from the Landfill.

## *C.  Defendants*

62.     Defendant Casella is a publicly traded corporation organized under the laws of Delaware and headquartered in Rutland, Vermont.  It is registered to do business in Massachusetts.  Casella is an operator of, and a transporter of waste to, the Landfill.

63.     Defendant SRDP, organized under the laws of Massachusetts, is a wholly-owned subsidiary of Casella headquartered in Rutland, Vermont.  SRDP is an operator of the Landfill.

64.     Defendant Town of Southbridge, a Massachusetts municipality in Worcester County, is the owner and a former operator of the Landfill.

## IV.  FACTUAL BACKGROUND

### A.  The Landfill's Management and Operation

65.   The Landfill was opened in approximately 1981.  Until 1996, the Town both owned and operated the Landfill.

66.   On December 9, 1996, the Town entered into an agreement with Wood Recycling, Inc. ("WRI") under which WRI would operate the Landfill.

67.   In October 2003 Casella purchased WRI.  Casella subsequently changed the name of WRI to Southbridge Recycling & Disposal Park, Inc. ("SRDP").

68.   Since 1996, WRI/SRDP has played a direct role in managing and funding the Landfill's operations and pollution control activities.  Its operational role includes, but is not limited to, the management and disposal of solid waste, groundwater well installation and monitoring, maintenance and operation of a leachate collection system, and provision of services incidental to pollution control.

69.   Since purchasing WRI in 2003, Casella has played a direct role alongside SRDP in managing and funding the Landfill's operations and pollution control activities. Its operational role includes, but is not limited to, its direct management of the Landfill's groundwater monitoring work.

### B.  The Landfill's Layout

70.   The Landfill contains approximately 51 acres of waste disposal space.

71.   The Landfill is divided into multiple units, or cells, that have been constructed sequentially over time, beginning in approximately 1981.  See Exhibit 4 (Site plan drawn by Defendants' consultant depicting the Landfill cells).

72.     Each Landfill cell is a unit formed out of either compacted subgrade (for Phases I and II) or synthetic liners (for Phases III through VII) into which waste is deposited.  Phases IIIC through VII of the Landfill incorporate leachate collection systems that are intended to direct liquid that has passed through solid waste (*i.e.*, leachate) to a network of channels, pipes, and/or pumps that transport the leachate to holding tanks or ponds.  <u>See</u> Exhibit 4.

73.     The Landfill is bordered by a network of wetlands on its southwestern, western, northwestern, and eastern sides.  <u>See</u> Exhibit 5 (Landfill Site Plan drawn by Defendants' consultant).  The wetland to the west of the Landfill is referred to as "Wetland A"; the wetland to the northwest of the Landfill, "Wetland Z"; and the wetland to the east of the Landfill, "Wetland I."

74.     Casella, SRDP, and/or their consultants collect quarterly samples both from groundwater monitoring wells located around the Landfill and from surface water monitoring locations in Wetlands A and I.  Exhibit 5 depicts the groundwater monitoring wells and surface water monitoring locations.

## C.  The Landfill's Pollution

75.     Between November 2011 and September 2017, Defendants and/or their consultants have identified elevated concentrations of the following pollutants in groundwater monitoring wells at the Landfill:  iron; 1,4-dioxane; lead; arsenic; manganese; copper; barium; sulfate; total dissolved solids ("TDS"); TCE; chlorobenzene; 1,1-DCA; 1,1-DCE; cis-1,2-DCE; toluene; chloroform; benzene; and naphthalene.

76.     Iron, 1,4-dioxane, lead, arsenic, manganese, sulfate, and TDS have been found in the Landfill's groundwater monitoring wells at concentrations that exceed

applicable Massachusetts Primary Maximum Contaminant Levels ("MMCLs"),

Secondary Maximum Contaminant Levels ("SMCLs"), or Office of Research and

Standards Guidelines ("ORSGs").

### i.  Pollution of the Wetlands

77.    Between November 2011 and September 2017, samples from surface water

monitoring locations in Wetland A and Wetland I have contained elevated concentrations

of iron, 1,4-dioxane, lead, arsenic, manganese, copper, barium, sulfate, and TDS.  Iron,

1,4-dioxane, and lead have been detected at surface water monitoring locations in these

wetlands in concentrations that exceed applicable Water Quality Standards or ORSGs.

78.    Sediment samples collected from Wetland A and the tributary through which

Wetland A drains to McKinstry Brook contain elevated concentrations of iron, arsenic,

manganese, copper, and barium that may pose a risk to sediment-dwelling organisms.

79.    Defendants' consultants have concluded that groundwater flowing

west/northwest through Landfill cells carries pollutants from the Landfill into Wetlands

A and Z, and that groundwater flowing east through Landfill cells carries pollutants from

the Landfill into Wetland I.

80.    The presence of elevated concentrations of the pollutants listed in Paragraph

77 in the Landfill's groundwater monitoring wells (see Paragraph 75) and the Wetlands,

together with the groundwater flow analyses performed by Defendants' consultants,

demonstrate that Landfill cells are adding these pollutants to Wetlands A, Z, and I.

### ii.  Pollution of Drinking Water Aquifers

81.    Pollutants released by the Landfill to groundwater also enter bedrock

fractures that transport these pollutants to drinking water aquifers in the area of No. Ten

Schoolhouse Road, Berry Corner Road, H Foote Road, Eleanor Lane, Sawmill Circle, and Hill Road in Charlton (the "Charlton Aquifers") and to drinking water aquifers in the area of McGilpin Road, Fiske Hill Road, Old Farms Road, Apple Hill Road, and Summit Ridge in Sturbridge (the "Sturbridge Aquifers").

### a. Charlton Aquifers

82.   At least 45 residential wells that draw water from the Charlton Aquifers, including the wells of 31 of the Individual Plaintiff Households (see Paragraphs 26–61) have been found to contain 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, naphthalene, lead, and/or arsenic since 2013.  At least 14 of these wells have been found to contain concentrations of 1,4-dioxane, TCE, 1,1-DCE, arsenic and/or lead that exceed the applicable MMCL or ORSG.

83.   The Landfill is the only known source of the above-listed chemicals found in the Charlton residential wells.

84.   The widespread presence of the pollutants listed in Paragraph 82 in Charlton residential wells demonstrates that the Charlton Aquifers are thoroughly contaminated. The presence of these same pollutants in the Landfill's groundwater monitoring wells (see Paragraph 75) demonstrates that the Landfill is the source of this contamination.

85.   These pollutants are continuously leaching from Landfill cells into groundwater and entering bedrock fractures that strike north/northeast from the Landfill. These fractures convey the pollutants to the Charlton residential wells, which are located between one-quarter and three-quarters of a mile to the north and northeast of the Landfill.

b.  Sturbridge Aquifers

86.    Beginning in January 2017, DEP and/or consultants retained by DEP have collected samples from 44 residential wells on McGilpin Road and Fiske Hill Road in Sturbridge and tested those samples for the presence of pollutants.  43 out of the 44 residential wells sampled have been found to contain lead and/or 1,4-dioxane.  At least 27 of these wells have been found to contain lead in concentrations that exceed the MMCL.

87.    The Landfill is the only known source of the lead and 1,4-dioxane found in the Sturbridge residential wells.

88.    The widespread presence of these pollutants in Sturbridge residential wells demonstrates that the Sturbridge Aquifers are thoroughly contaminated.  The presence of these same pollutants in the Landfill's groundwater monitoring wells (see Paragraph 75) demonstrates that the Landfill is the source of this contamination.

89.    These pollutants are continuously leaching from Landfill cells and entering bedrock fractures that strike west/northwest from the Landfill.  These fractures convey the pollutants to the Sturbridge wells, which are located within approximately one mile of the Landfill to its west and northwest.

### iii.  Odor and Noise Pollution

90.    Decomposing organic material at the Landfill releases malodorous gases, such as hydrogen sulfide and ammonia, to the air.  These gases migrate into the surrounding communities and befoul the air at the Individual Plaintiffs' properties.

91.    When the odors are present, the Individual Plaintiffs do not open windows in their homes.  They do not enjoy their yards.  They do not take walks.  Their children do

not play outside.  They are embarrassed to have guests.  Their enjoyment of their homes and their quality of life is thus severely diminished.

92.    Chemical deodorizing sprays, or "misters," deployed at times by Casella and SRDP in an attempt to mask the Landfill's malodorous gas emissions, have a sickening odor and serve only to further befoul the air at the Individual Plaintiffs' properties.

93.    The Landfill's waste disposal activities generate an incessant daily racket of heavy trucks and machinery crashing, banging, and beeping.  Particularly for the Individual Plaintiffs who live closest to the Landfill, this noise is intolerable.  It is a constant irritant and distraction, robbing them of the capacity to enjoy and focus on their daily lives.

## V.  CLAIMS

### COUNT 1: VIOLATIONS OF THE CLEAN WATER ACT

94.    Paragraphs 1–80 are hereby re-alleged and incorporated by reference herein.

95.    Count 1 is brought by the Group Plaintiffs only, against all Defendants.

96.    As set out below, Defendants are in ongoing violation of the CWA because of the Landfill's discharge of pollutants—including, but not limited to, 1,4-dioxane, iron, lead, arsenic, manganese, copper, barium, sulfate, and TDS—to Wetlands A, Z, and I.

#### i.  Citizen Enforcement Suits Under the Clean Water Act

97.    The objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

98.    The CWA prohibits the addition of any pollutant to navigable waters from any point source except as authorized by a NPDES permit applicable to that point source. 33 U.S.C. §§ 1311(a), 1342, 1362(12).

18

99. The CWA authorizes citizens to commence an enforcement action against any person who violates "an effluent standard or limitation" of the CWA, including any addition of a pollutant from a point source to navigable waters without NPDES permit authorization.  33 U.S.C. §§ 1365(a), (f).

100. The CWA grants jurisdiction to United States District Courts to enforce effluent standards or limitations, to issue injunctions, to impose appropriate civil penalties for violations, and to award costs of litigation to citizen plaintiffs.  33 U.S.C. §§ 1365(a), (d).

### *ii. Defendants' Clean Water Act Violations*

101. Defendants' ongoing discharges of pollutants from the Landfill to Wetlands A, Z, and I violate Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, because: (a) the Landfill is a point source; (b) Wetlands A, Z, and I are navigable waters; (c) the Landfill is adding pollutants to the Wetlands; and (d) Defendants are not authorized by NPDES permit to discharge contaminated groundwater from the Landfill to the Wetlands.

### a.  The Landfill is a Point Source.

102. The CWA defines point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

103. Each of the Landfill's cells is bordered and underlain by compacted subgrade and/or synthetic liners and is intended to function as a confined and discrete

impoundment for holding solid and liquid waste and, in the case of cells constructed in Phases IIIC–VII, is intended to direct liquid waste toward leachate collection systems.

104. Each Landfill cell concentrates pollutants by holding solid and liquid waste in a defined location.  These pollutants penetrate the compacted subgrade and liners underlying the cells and enter groundwater beneath and alongside the Landfill.  The cells thereby convey these pollutants to the Wetlands via the groundwater flowing through and near the cells.

105. Because it is composed of containers (cells) designed to hold wastes and wastewater, and those containers (cells) convey pollutants to surface waters, the Landfill (and each of its cells) meets the CWA's definition of a point source.

b.  The Wetlands are Navigable Waters.

106. The CWA defines navigable waters as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  "Waters of the United States" are defined by EPA regulation to include, *inter alia*, all tributaries to interstate waters, and wetlands adjacent to those tributaries.  See 40 C.F.R. § 122.2.

107. Wetlands A, Z, and I drain north through an unnamed tributary to McKinstry Brook and maintain a direct hydrological connection with McKinstry Brook.  There is no clear demarcation between the Wetlands and McKinstry Brook.

108. McKinstry Brook is a "navigable water."  It is a permanent flowing body of water that empties into the Quinebaug River, which in turn flows southward from the Town of Southbridge into Connecticut.

109. Wetlands A, Z, and I are accordingly "navigable waters" within the meaning of the CWA.

### c.  The Landfill is Adding Pollutants to the Wetlands.

110.  The CWA defines "pollutant" as including, *inter alia*, "solid waste" and "chemical wastes."  33 U.S.C. § 1362(6).  All of the chemicals released by the Landfill into groundwater, as described above (see Paragraph 77), are both solid waste (because they have been discarded) and chemical wastes (because they are discarded chemicals). They are thus "pollutants" within the meaning of the CWA.

111.  As detailed above (see Paragraphs 77–80), the Landfill is conveying these pollutants to the Wetlands through hydrologically connected groundwater.  The Landfill is thus adding pollutants to the Wetlands.

### d.  Defendants Are Not Authorized to Discharge Contaminated Groundwater to the Wetlands From the Landfill.

112.  The Landfill is subject to the 2015 NPDES Multi-Sector General Permit ("MSGP").  The MSGP authorizes certain stormwater discharges associated with industrial activity.

113.  The MSGP does not authorize discharges of contaminated groundwater.

114.  Section 8.L.3.1 of the MSGP, concerning sector-specific requirements for "Landfills, Land Application Sites, and Open Dumps," states that the MSGP does not authorize discharges of leachate, drained free liquids, or contaminated groundwater.

115.  Leachate is defined in MSGP section 8.L.4.4 as "liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste."

116.  Defendants do not have a NPDES permit that authorizes the discharge of contaminated groundwater from the Landfill to the Wetlands.

117.  The Landfill's discharges of pollutants to Wetlands A, Z, and I are continuous and ongoing.

118.  The Landfill has discharged pollutants to Wetlands A, Z, and I each day from February 13, 2012, through the present, and will continue to discharge pollutants to Wetlands A, Z, and I each day unless or until action is taken to stop the discharge.

119.  Each discharge of a pollutant to one of these wetlands constitutes a violation of the CWA.

*iii.   The Group Plaintiffs and Their Members are Harmed By The CWA Violations.*

120.  Members of Toxics Action and Environment Massachusetts live near, own property near, work near, and recreate near and in McKinstry Brook and its wetlands downstream of where the Landfill discharges pollutants into Wetlands A, Z, and I.

121.  The Group Plaintiffs have members who walk near and in McKinstry Brook and its wetlands, and enjoy viewing aquatic life, near and downstream of where Wetlands A, Z, and I empty into McKinstry Brook.

122.  The Group Plaintiffs have members whose children play in and around McKinstry Brook and its wetlands near and downstream of where Wetlands A, Z, and I empty into McKinstry Brook.

123.  The Group Plaintiffs have members who have observed discoloration and other signs of pollution in McKinstry Brook and its wetlands (including brown and/or orange discoloration, which can be attributable to iron pollution), which has decreased their enjoyment of these areas.

124.  The Group Plaintiffs have members who are concerned that McKinstry Brook and its wetlands have been polluted by discharges from the Landfill and that the

health of aquatic life has been harmed by this pollution.  Their enjoyment derived from activities in and around McKinstry Brook and its wetlands is diminished knowing that these waterways are polluted.

125.  The Group Plaintiffs have members who are concerned about their health and safety, and the health and safety of their children, as a result of having spent time in the presence of pollutants discharged by the Landfill to McKinstry Brook and its wetlands.

126.  The Group Plaintiffs have members who spend less time in and around McKinstry Brook and its wetlands than they otherwise would because they are aware that the Landfill illegally discharges pollutants to these waterways.

### *COUNT 2: RCRA IMMINENT AND SUBSTANTIAL ENDANGERMENT*

127.  Paragraphs 1–89 are hereby re-alleged and incorporated by reference herein.

128.  The Group Plaintiffs and the Individual Plaintiffs bring Count 2 against all Defendants.

129.  As set out below, Defendants' past and present handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste at the Landfill—specifically, the construction and operation of the Landfill in a way that allows toxic pollutants to be released from Landfill cells and to contaminate drinking water aquifers for residential wells in Charlton and Sturbridge, and the operation of the Landfill in a manner that allows the contamination to continue and to worsen—have created, and are exacerbating, an imminent and substantial endangerment to health or the environment within the meaning of RCRA.

### *i.  RCRA "Imminent and Substantial Endangerment" Actions*

130.  The objectives of RCRA are "to promote the protection of health and the environment and to conserve valuable material and energy resources."  42 U.S.C. § 6902(a).

131.  RCRA authorizes citizens to commence an action against any person "including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  Id. § 6972(a)(1)(B).

132.  RCRA grants jurisdiction to United States District Courts "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste [which may present an imminent and substantial endangerment to health or the environment], . . . to order such person to take such other action as may be necessary, or both," and to award costs of litigation to citizen plaintiffs. Id. §§ 6972(a), (e).

### *ii.  Defendants Have Contributed and Are Contributing to the Past and Present Handling, Storage, Treatment, Transportation, and Disposal of Solid and Hazardous Waste Which May Present an Imminent and Substantial Endangerment.*

133.  Casella and SRDP have arranged for the construction of Landfill cells, transported waste, prepared waste for disposal, disposed of waste, applied cover material, and/or maintained and operated leachate collection and pollution control systems in a manner that allows toxic waste material—including but not limited to lead, arsenic, 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, benzene,

naphthalene, and chloroform—to be released to groundwater.

134. The Town has exercised its ownership obligations, arranged for the construction of landfill cells, prepared waste for disposal, disposed of waste, applied cover material, and/or managed pollution control systems in a manner that allows toxic waste material—including but not limited to lead, arsenic, 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, benzene, naphthalene, and chloroform—to be released to groundwater.

135. The Landfill's groundwater monitoring results confirm that the Landfill is releasing the pollutants listed in Paragraphs 133 and 134 to groundwater on a continuous and ongoing basis.  See Paragraphs 74 – 76; see also Exhibit 5.

136. The presence of 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, naphthalene, lead, and/or arsenic in the Charlton and Sturbridge Aquifers, and the continuing release of these pollutants from the Landfill to bedrock groundwater, present a reasonable prospect of serious potential harm to individuals who rely on these aquifers for their water supply.

137. These pollutants pose risks of serious harm to human health and/or the environment, including but not limited to the following:

    a.    1,4-dioxane is a likely human carcinogen, chronic exposure to which can also result in kidney and liver damage.

    b.    TCE is carcinogenic to humans by all routes of exposure and can cause liver, kidney, immune system, and central nervous system damage.

    c.    Chronic exposure to chlorobenzene can result in kidney, liver, and central nervous system damage.

      d.      1,1-DCA and 1,1-DCE are classified by EPA as possible human carcinogens.

      e.      Chronic exposure to cis-1,2-DCE may result in liver, circulatory, and nervous system damage.

      f.      Chronic exposure to toluene can harm the central nervous system, resulting in drowsiness, ataxia, tremors, cerebral atrophy, nystagmus, and impaired speech, hearing, and vision.

      g.      Chronic exposure to benzene in drinking water can result in anemia, a decrease in blood platelets, and an increased risk of cancer.

      h.      The U.S. Department of Health and Human Services has concluded that naphthalene is reasonably anticipated to be a human carcinogen.

      i.      Exposure to lead in drinking water can cause development delays, slowed growth, hearing problems, and anemia in children; cardiovascular, kidney, and reproductive damage in adults; and reduced fetal growth and premature birth in pregnant women.

      j.      Chronic exposure to arsenic can result in increased rates of skin, bladder, lung, kidney, liver, and prostate cancers, as well as cardiovascular, pulmonary, immunological, neurological, and endocrine damage.

138. Many of the pollutants listed above can have synergistic effects on humans. That is, when an individual is exposed to more than one of these pollutants, the combination of pollutants may cause harm at lower concentrations than would be expected if the individual were only exposed to one of the pollutants.

139.  Testing performed by Casella, SRDP, DEP, and/or their consultants shows that at least 39 residential wells that draw water from the Charlton or Sturbridge Aquifers have been found to contain two or more of the pollutants listed in Paragraph 136.

### iii. The Endangerment Has Not Been Abated.

#### a.  Bottled Water and Filtration Systems Are Not Sufficient.

140.  In response to the contaminants identified in Charlton and Sturbridge residential wells, Casella, SRDP, the Town, and/or their consultants have provided bottled water and/or installed point-of-entry ("POET") water filtration systems for some of the Charlton homes whose wells have tested positive for the presence of Landfill pollutants.

141.  DEP has offered to temporarily supply bottled water to homes on McGilpin Road and Fiske Hill Road in Sturbridge that have tested positive for the presence of pollutants while DEP investigates the contamination.

142.  The provision of bottled water and/or POET systems to some of the homes that rely on the Charlton and Sturbridge Aquifers does not abate the endangerment presented by the Landfill's ongoing pollutant releases to drinking water aquifers.

143.  Bottled water and/or POET systems are not provided to all residents whose wells have tested positive for one or more pollutants released by the Landfill to groundwater.  Nor have bottled water and/or POET systems been provided to homes at risk of contamination that have not been tested, or have not yet tested positive, for the presence of these pollutants.

144.  The bottled water that is provided by Defendants or DEP does not adequately meet all recipients' drinking, cooking, bathing, and other needs.

145.  Residential well testing since the installation of POET systems in certain Charlton homes has shown that the efficacy of the systems can diminish over time.  In as few as six months after a POET system is installed, pollutants including 1,4-dioxane and/or chlorobenzene have been detected in water that has emerged from the first of two carbon activation vessels that comprise the filtration systems.

b.  The 2017 Consent Order is Not Sufficient.

146.  On or about April 26, 2017, DEP, Casella, SRDP, the Town of Southbridge, and the Town of Charlton entered into Administrative Consent Order No. 00001100 ("2017 Consent Order"), which provides for the construction of a municipal water line (the "Water Line") to service homes on H Foote Road, Eleanor Lane, and Berry Corner Road in Charlton.

147.  The 2017 Consent Order does not abate the endangerment presented by the Landfill's ongoing pollutant releases to drinking water aquifers.

148.  If constructed, the Water Line would not provide municipal water service to any homes on No. Ten Schoolhouse Road, Sawmill Circle, or Hill Road in Charlton that draw water from the Charlton Aquifers, nor would it provide municipal water service to any homes that draw water from the Sturbridge Aquifers.

149.  The 2017 Consent Order does not require Casella, SRDP, or the Town to take any measures to prevent the release of pollutants from the Landfill to drinking water aquifers.

150.  Actual construction and operation of the Water Line depends on a series of contingencies including, but not limited to: (i) the Town of Southbridge's receipt of funds from SRDP for the design, engineering, and construction of the Water Line; (ii) the Town

of Charlton's acquisition of real property for the construction of a pump station at the intersection of Southbridge Road and Berry Corner Road; (iii) successful construction of the pump station at the intersection of Southbridge Road and Berry Corner Road; and (iv) the Town of Southbridge's ability to secure additional funds to pay the costs of the Water Line if those costs exceed $10,000,000.

151. If any of the above contingencies does not come to pass, the Water Line will not be constructed and operated as planned.

152. Due to a delay in the acquisition of the property necessary for the pumping station described in Paragraph 150, physical construction of the Water Line will likely not commence until late 2018.

<u>c.  The Planned Closure of the Landfill is Not Sufficient.</u>

153. In an August 3, 2017, letter, Casella informed the Town that it planned to cease operation of the Landfill during calendar year 2018 and that SRDP would proceed to "cap and close" the Landfill.

154. Landfill closure would not abate the endangerment presented by the Landfill's ongoing pollutant releases to drinking water aquifers or by the current contamination of those aquifers.

155. Neither closing nor capping the Landfill would prevent ongoing releases of pollutants from the Landfill to groundwater.  Liquid matter in the Landfill would continue to generate leachate, which would continue to escape the Landfill cells.

156. Neither closing nor capping the Landfill would remediate the pollutants already released by the Landfill to the Charlton and Sturbridge Aquifers.

*iv. The Individual Plaintiffs and the Group Plaintiffs' Members are Harmed by the Imminent and Substantial Endangerment Created by Defendants.*

157. The Individual Plaintiffs and members of the Group Plaintiffs live in homes in Charlton and Sturbridge with private wells.  These wells draw their water from the aquifers that the Landfill has contaminated with lead, arsenic, 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, and naphthalene.

158. The Individual Plaintiffs and members of the Group Plaintiffs are distressed by the potential health effects to themselves, their families, and their neighbors from exposure to the Landfill's pollutants in their well water.

159. The Individual Plaintiffs and members of the Group Plaintiffs avoid drinking water from the wells at their homes in Charlton and Sturbridge.  Many of them also avoid cooking, washing, or brushing their teeth with their well water.  They are loath to bathe in their well water.  Many buy bottled water or have bought water treatment systems in an effort to lessen their exposure to the Landfill's pollutants.

160. Despite the use of water treatment systems at some of their homes, the Individual Plaintiffs and members of the Group Plaintiffs are concerned that the treatment systems do not remove all of the Landfill's pollutants.

161. The Individual Plaintiffs and members of the Group Plaintiffs are harmed because they at one time had a clean, safe water supply, and now must choose between drinking contaminated or potentially contaminated water and either installing a treatment system or securing alternative drinking water.

162. The Individual Plaintiffs and members of the Group Plaintiffs are concerned that testing performed on their residential wells does not always accurately reflect

pollutant levels.  They are concerned that the pollutant levels at any given point in time may be significantly higher than indicated by the last round of testing.

163.  The Individual Plaintiffs and members of the Group Plaintiffs fear for their health because they are exposing themselves to aerosolized pollutants when they shower or bathe using water contaminated by the Landfill's pollutants.

164.  The Individual Plaintiffs and members of the Group Plaintiffs are harmed because the value of their homes has been diminished by the Landfill's contamination of their wells, or by the threat thereof.  The return on the money, time, and labor they have invested in their homes has been diminished by this loss in value.

### *COUNT 3: PROPERTY DAMAGE UNDER M.G.L. c. 21E, § 5*

165.  Paragraphs 1–89 and 127–164 are hereby re-alleged and incorporated by reference herein.

166.  Count 3 is brought by the Individual Plaintiffs only, against all Defendants.

167.  M.G.L. c. 21E *et seq.* is the Massachusetts Oil and Hazardous Material Release Prevention and Response Act.

168.  Under M.G.L. c. 21E, § 5(a), "the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material … shall be liable, without regard to fault … to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release."

169.  "Hazardous material," within the meaning of M.G.L. c. 21E, means "material including but not limited to, any material, in whatever form, which, because of its quantity, concentration, chemical, corrosive, flammable, reactive, toxic, infectious or radioactive characteristics, either separately or in combination with any substance or

substances, constitutes a present or potential threat to human health, safety, welfare, or to the environment, when improperly stored, treated, transported, disposed of, used, or otherwise managed. … The term shall also include all those substances which are included under 42 U.S.C. Sec. 9601(14), but it is not limited to those substances." M.G.L. c. 21E, § 2.

170.  Under 42 U.S.C. § 9601(14), hazardous substances include "any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act"—that is, 33 U.S.C. § 1317(a).

171.  The toxic pollutant list established under 33 U.S.C. § 1317(a) is at 40 C.F.R. § 401.15.  Lead, arsenic, TCE, chlorobenzene, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, and naphthalene are on the list.

172.  Under the authority of M.G.L. c. 21E, as part of the Massachusetts Contingency Plan, DEP has also established a list of hazardous materials.  See 310 CMR 40.0974.  Lead, arsenic, 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, and naphthalene are on the list.

173.  Lead, arsenic, 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, and naphthalene are hazardous materials within the meaning of M.G.L. c. 21E, both by virtue of their toxicity and by virtue of their inclusion in the lists at 40 C.F.R. § 401.15 or 310 CMR 40.0974, or both.

174.  The Landfill is "a site from or at which there is or has been a release or threat of release of … hazardous material" within the meaning of M.G.L. c. 21E, § 5(a). These hazardous materials include, but are not limited to, lead, arsenic, 1,4-dioxane,

TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis-1,2-DCE, toluene, chloroform, benzene, and naphthalene.

175. The Landfill's release and threatened release of hazardous materials to groundwater has damaged the Individual Plaintiffs' real properties by diminishing their value.  This is true both for those Individual Plaintiffs whose wells have thus far been contaminated by the Landfill's hazardous materials and for those Individual Plaintiffs whose wells are threatened with such contamination.  In either case, the properties have been devalued, as buyers of real estate are disinclined to purchase properties with wells that either are or imminently may be contaminated.

176. In the event and to the degree that municipal water is ultimately provided for the Individual Plaintiffs, the diminution in their property values will persist, both because their homes and neighborhood have been stigmatized by the Landfill's releases of hazardous materials, and because their homes will carry a cost—that of paying for municipal water—that they had not previously carried.

177.  As operators of the Landfill, Casella and SRDP are liable without regard to fault under M.G.L. c. 21E, § 5(a), for the damage that the Landfill's releases of hazardous materials have caused to the Individual Plaintiffs' properties.

178.  As the owner and former operator of the Landfill, the Town is liable without regard to fault under M.G.L. c. 21E, § 5(a), for the damage that the Landfill's releases of hazardous materials have caused to the Individual Plaintiffs' properties.

## *COUNT 4: CONTINUING PRIVATE NUISANCE*

179.  Paragraphs 1–93 and 127–178 are hereby re-alleged and incorporated by reference herein.

180. Count 4 is brought by the Individual Plaintiffs only, against all Defendants.

181.  Under the common law of Massachusetts, a person is liable for private nuisance when, on property that he owns or controls, he creates, permits, or maintains a condition that causes a substantial and unreasonable interference with the use and enjoyment of the property of another.

182. As set forth in Paragraphs 22–61, 82–85, 90–93, and 127–164 above, the Landfill's odor, noise, and groundwater pollution have each severely diminished the Individual Plaintiffs' use and enjoyment of their properties, and diminished the value thereof.  For years, the Landfill's various pollution has plagued the Individual Plaintiffs, bringing daily disruption, distraction, fear, anger, frustration, physical discomfort, and psychological stress to their lives.

183. The Landfill's recurring emissions of malodorous gases and offensive noise have caused, and continue to cause, a substantial and unreasonable interference with the Individual Plaintiffs' use and enjoyment of their properties, and constitute a continuing private nuisance.

184. The Landfill's continuing contamination of the Charlton Aquifers, its contamination of the Individual Plaintiffs' wells, and the threat of further such contamination has caused, and continues to cause, a substantial and unreasonable interference with the Individual Plaintiffs' use and enjoyment of their properties, and constitutes a continuing private nuisance.

185. Casella and SRDP are liable for the above-described nuisances because they control the Landfill and its polluting activities.  The Town is liable for these nuisances because it owns and previously controlled the Landfill.

### COUNT 5: CONTINUING TRESPASS

186. Paragraphs 1–93 and 127–178 are hereby re-alleged and incorporated by reference herein.

187. Count 5 is brought by the Individual Plaintiffs only, against all Defendants.

188. Under the common law of Massachusetts, a trespass is an act of physical interference with a landowner's exclusive possession of his property.

189. The Landfill's recurring pollution of the Individual Plaintiffs' properties with malodorous gases is an act of physical interference with their exclusive possession of their properties, and constitutes a continuing trespass.

190. The Landfill's contamination of the Individual Plaintiffs' wells with toxic pollutants is an act of physical interference with their exclusive possession of their properties, and constitutes a continuing trespass.

191. Casella and SRDP are liable for the above-described trespasses because they control the Landfill and its polluting activities. The Town of Southbridge is liable for these trespasses because it owns and previously controlled the Landfill.

### COUNT 6: UNJUST ENRICHMENT

192. Paragraphs 1–93 are hereby re-alleged and incorporated by reference herein.

193. Count 6 is brought by the Individual Plaintiffs only, against Casella and SRDP.

194. Under the common law of Massachusetts, unjust enrichment is the acquisition of some benefit at the expense of another, where the retention of that benefit would be inequitable.

195.    Casella and SRDP have consistently and knowingly failed to invest in available odor and noise control technologies that would prevent or mitigate the Landfill's odor and noise pollution.

196.   Casella and SRDP possess adequate funds to invest in improved odor and noise control technologies—according to its 2016 Annual Report, Casella's revenue in 2016 was $565,000,000—but have opted to retain those funds and to continue to pollute the Individual Plaintiffs' properties.  In effect, rather than pay to contain their pollution, Casella and SRDP have opted to take a pollution easement on the Individual Plaintiffs' properties.

197.   By taking a *de facto* pollution easement on the Individual Plaintiffs' properties rather than paying to contain their odor and noise pollution, Casella and SRDP have been unjustly enriched at the Individual Plaintiffs' expense.

## VI.   JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

## VII.   RELIEF REQUESTED

As to Count 1, the Group Plaintiffs request that this Court:

a.   Declare Defendants to have violated and to be in violation of the Clean Water Act by committing each of the violations described above in Count 1;

b.   Order Defendants to comply with the CWA, and to refrain from further violations;

c.   Order Defendants to implement measures to remedy, mitigate, or offset the harm to the environment caused by the violations alleged in Count 1;

d.  Assess an appropriate civil penalty against Defendants of up to $52,414 per day for each violation of the CWA, as provided by 33 U.S.C. § 1319(d);

e.  Award the Group Plaintiffs their costs of litigation (including reasonable attorney and expert witness fees), as provided by 33 U.S.C. § 1365(d);

f.  Order such other relief as the Court deems appropriate.

As to Count 2, the Group Plaintiffs and the Individual Plaintiffs request that this Court:

a.  Declare Defendants "to have contributed and to be contributing to the past or present handling, storage, treatment, transportation, or disposal of [] solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" within the meaning of 42 U.S.C. § 6972(a)(1)(B), as described in Count 2;

b.  Order Defendants to implement measures to eliminate, remedy, mitigate, monitor, and offset the imminent and substantial endangerment to health and the environment, and the harm to health and the environment caused by the endangerment, described in Count 2, as provided by 42 U.S.C. § 6972(a);

c.  Award the Group Plaintiffs and Individual Plaintiffs their costs of litigation (including reasonable attorney and expert witness fees), as provided by 42 U.S.C. § 6972(e);

d.  Order such other relief as the Court deems appropriate.

As to Count 3, the Individual Plaintiffs seek the following relief:

a.  An award of damages to compensate them for the diminution in value of their properties, under M.G.L. c. 21E, § 5(a);

b.  An award of their costs of litigation (including reasonable attorney and expert witness fees), as provided by M.G.L. c. 21E, § 15;

c.  An award of interest on any damage award, calculated at the Massachusetts statutory interest rate of 12% per annum; and

d.  Such other relief as the Court deems appropriate.

As to Counts 4 and 5, the Individual Plaintiffs seek the following relief:

a.  An order enjoining further operation of the Landfill;

b.  An order enjoining Defendants' further pollution of groundwater at and around the Landfill;

c.  An order mandating that Defendants fully investigate the extent of their groundwater contamination;

d.  An order mandating that Defendants fully remediate the groundwater that they have contaminated;

e.  An order mandating that Defendants prospectively monitor all Individual Plaintiffs' wells for pollutants until such time as they receive municipal water.

f.  An order mandating that Defendants provide municipal water for each of their homes;

g.  An order enjoining any further emission of nuisance odors or noise from the Landfill;

h.  An award of damages to compensate them for the diminution in value of their properties caused by Defendants' nuisance and trespass;

i.  An award of damages to compensate them for their lost use and enjoyment of their properties caused by Defendants' nuisance and trespass;

j.  An award of damages to compensate them for the loss of quality of life and psychological stress caused by Defendants' nuisance and trespass;

k.  An award of damages to compensate them for the cost of any water that they have purchased or will have to purchase to replace the water that they formerly drew from their wells;

l.  An award of damages to compensate them for the cost of any water treatment systems that they have purchased or will have to purchase in an effort to protect themselves from the Landfill's pollutants;

m.  An award of damages to compensate them for any damage that is done to their properties in the process of installing municipal water at their homes;

n.  An award of interest on any damage award, calculated at the Massachusetts statutory interest rate of 12% per annum; and

o.  Such other relief as the Court deems appropriate.

As to Count 6, the Individual Plaintiffs seek the following relief:

a.  A disgorgement of the financial benefits that have accrued to Defendants in consequence of their failure to invest in timely and appropriate odor and noise control technologies, with restitution to the Individual Plaintiffs in that amount;

b.  An award of interest on any restitution, calculated at the Massachusetts statutory interest rate of 12% per annum; and

c.  Such other relief as the Court deems appropriate.

Respectfully Submitted by the Group Plaintiffs,

By their Attorneys:

*/s/ Kevin P. Budris*
Kevin P. Budris (BBO # 680075)
Joshua R. Kratka (BBO # 544792)
Charles C. Caldart (BBO # 547064)
National Environmental Law Center
294 Washington Street, Suite 500
Boston, MA 02108
(617) 747-4304
Email: kevin.budris@nelconline.org
Email: josh.kratka@nelconline.org
Email: cccnelc@aol.com

David A. Nicholas (BBO # 553996)
20 Whitney Road
Newton, MA 02460
(617) 964-1548
Email: dnicholas@verizon.net

Respectfully Submitted by the Individual Plaintiffs,

By their Attorney:

*/s/ James P. Vander Salm*
James P. Vander Salm (BBO # 663320)
Law Office of James P. Vander Salm
30 Clairmont Street
Longmeadow, MA 01106
(413) 935-1890
jvandersalm@vandersalmlaw.com

Dated: November 14, 2017

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1 and LR 7.3, Plaintiffs Toxics Action Center, Inc. and Environment America, Inc. state that they have no parent corporation, and are not owned to any degree by any publicly held company.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2017, I filed a copy of this document with the Court's ECF system, which will cause an electronic notice of such filing to be sent to all counsel who have appeared in this case.

<u>/s/ *Kevin P. Budris*</u>
Kevin P. Budris