_____ )
TOXICS ACTION CENTER, INC. *et al*, )
                           Plaintiffs, )
                           )
                           )
v.                            )      CIVIL ACTION
                           )      No. 4:17-cv-40089
                           )
CASELLA WASTE SYSTEMS, INC., )
SOUTHBRIDGE RECYCLING & DISPOSAL )
PARK, INC. and THE TOWN OF )
SOUTHBRIDGE )
                           Defendants )
_____ )

## MEMORANDUM OF DECISION AND ORDER ON DEFENANT ON DEFENDANTS' CASELLA WASTE SYSTEMS AND SOUTHBRIDGE RECYCLING AND THE TOWN OF SOUTHBRIDGE'S MOTIONS TO DISMISS
### September 30, 2018

**HILLMAN, DJ.**

## Introduction

This action is brought by two sets of Plaintiffs: (a) Two non-profit environmental organizations, Toxics Action Center, Inc. ("Toxics Action") and Environment America, Inc. d/b/a Environment Massachusetts ("Environment Massachusetts") (collectively, the "Group Plaintiffs"); and (b) Ninety-nine individuals who reside or recently resided near the Landfill in Charlton (the "Individual Plaintiffs"). Plaintiffs bring this action under the citizen suit provisions of two federal environmental statutes, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act," or "CWA"). The RCRA claim, which is brought both by the Group Plaintiffs and the Individual Plaintiffs, alleges that Defendants have contributed and are

contributing to an imminent and substantial endangerment to human health and the environment within the meaning of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B). The CWA claim, brought solely by the Group Plaintiffs, alleges that Defendants are discharging pollutants to waters of the United States without National Pollutant Discharge Elimination System ("NPDES") Permit authorization, in violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342. The Individual Plaintiffs bring several supplemental state law claims, which will not be addressed in this memorandum: a statutory claim under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E ("c. 21E"), and common law claims of nuisance, trespass, and unjust enrichment.

Defendants Casella Waste Systems, Inc. and Southbridge Recycling and Disposal Park, Inc. ("SRDP Defendants") and the Town of Southbridge ("the Town") (collectively, "the Defendants") move to dismiss claims alleged against them under the Clean Water Act (by Group Plaintiffs only) and the Resource Conservation and Recovery Act (by Group Plaintiffs and Individual Plaintiffs). Both contend that this Court lacks subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) to adjudicate the Clean Water Act (Count 1) and Resource Conservation and Recovery Act (Count 2) claims. Defendants also argue that the allegations fail to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).

This Memorandum of Decision and Order addresses Defendants' motions to dismiss Counts I and II (Docket Nos. 44 and 46). For the reasons set forth below, those motions are *granted*.

## Facts

The Town of Southbridge established and operated the Landfill on Town property beginning in 1981 and has continuously owned the Landfill. The Town constructed and operated

Phases I, II and III of the Landfill. In 1996, the Town contracted with Wood Recycling, Inc. ("WRI") to operate the Town Landfill on behalf of the Town. WRI designed, engineered and constructed subsequent Phases IV, V, VI and 7.1A. In 2003, CWSI purchased WRI. As a condition of purchase, CWSI entered into a settlement with the Massachusetts Department of Environmental Protection ("MassDEP") and the Attorney General, addressing alleged prior WRI violations for which CWSI had no involvement. Casella subsequently changed the name of WRI to Southbridge Recycling & Disposal Park, Inc. ("SRDP").

The Landfill contains approximately 51 acres of waste disposal space and is divided into multiple units, or cells, that have been constructed sequentially over time, beginning in approximately 1981. Each Landfill cell is a unit formed out of either compacted subgrade (for Phases I and II) or synthetic liners (for Phases III through VII) into which waste is deposited. Phases IIIC through VII of the Landfill incorporate leachate collection systems that are intended to direct liquid that has passed through solid waste (*i.e.*, leachate) to a network of channels, pipes, and/or pumps that transport the leachate to holding tanks or ponds. The Landfill is bordered by a network of wetlands on its southwestern, western, northwestern, and eastern sides. The wetland to the west of the Landfill is referred to as "Wetland A"; the wetland to the northwest of the Landfill, "Wetland Z"; and the wetland to the east of the Landfill, "Wetland I." Casella, SRDP, and their consultants collect quarterly samples both from groundwater monitoring wells located around the Landfill and from surface water monitoring locations in Wetlands A and I.

Between November 2011 and September 2017, Defendants and their consultants have identified elevated concentrations of several pollutants in groundwater monitoring wells at the

Landfill.[1] Between November 2011 and September 2017, samples from surface water monitoring locations in Wetland A and Wetland I have contained elevated concentrations of similar pollutants have been detected at surface water monitoring locations in these wetlands in concentrations that exceed applicable Water Quality Standards or ORSGs. [2] Plainitffs allege that groundwater flowing west/northwest through Landfill cells carries pollutants from the Landfill into Wetlands A and Z, and that groundwater flowing east through Landfill cells carries pollutants from the Landfill into Wetland I.

Plaintiffs allege that pollutants released by the Landfill to groundwater also enter bedrock fractures that transport these pollutants to drinking water aquifers in the area of No. Ten Schoolhouse Road, Berry Corner Road, H Foote Road, Eleanor Lane, Sawmill Circle, and Hill Road in Charlton (the "Charlton Aquifers") and to drinking water aquifers in the area of McGilpin Road, Fiske Hill Road, Old Farms Road, Apple Hill Road, and Summit Ridge in Sturbridge (the "Sturbridge Aquifers").

Thirty one of the residential wells of the Individual Plaintiffs that draw from the Charlton Aquifers have been found to contain some level of 1,4-dioxane, TCE, chlorobenzene, 1,1-DCA, 1,1-DCE, cis- 1,2-DCE, toluene, chloroform, benzene, naphthalene, lead, and/or arsenic since 2013. At least 14 of these wells have been found to contain concentrations of 1,4-dioxane, TCE, 1,1-DCE, arsenic and/or lead that exceed the applicable limits. Plaintiffs' allege that because the Landfill is the only known source of the above-listed chemicals found in the Charlton residential wells, this demonstrates that the Landfill is the source of this contamination.

---

[1] These include iron; 1,4-dioxane; lead; and arsenic. Certain pollutants, including iron, 1,4-dioxane, lead, arsenic, manganese, sulfate, and TDS have been found in the Landfill's groundwater monitoring wells at concentrations that exceed applicable Massachusetts Primary Maximum Contaminant Levels ("MMCLs"), Secondary Maximum Contaminant Levels ("SMCLs"), or Office of Research and Standards Guidelines ("ORSGs")

[2] These include iron, 1,4-dioxane, lead, arsenic, manganese, copper, barium, sulfate, and TDS. Iron, 1,4-dioxane, and lead.

Beginning in January 2017, DEP and/or consultants retained by DEP have collected samples from 44 residential wells on McGilpin Road and Fiske Hill Road in Sturbridge and tested those samples for the presence of pollutants. 43 out of the 44 residential wells sampled have been found to contain lead and/or 1,4-dioxane. At least 27 of these wells have been found to contain lead in concentrations that exceed the applicable limits. Plaintiffs' allege that because the Landfill is the only known source of the above-listed chemicals found in the Sturbridge residential wells, this demonstrates that the Landfill is the source of this contamination.

The water testing data upon which the Plaintiffs' Amended Complaint relies is largely the result of testing performed by Casella/SRDP in Charlton, as required by MassDEP, and by MassDEP itself in Sturbridge. This testing is designed to identify the extent of any groundwater contamination and what further remedial measures may be necessary. Since 2002, SRDP has conducted a residential well monitoring program. In 2015, in response to detected groundwater contamination in some residential wells, SRDP began providing bottled water to certain residents and/or installed Point of Entry Treatment ("POET") systems at affected homes. Defendants are providing residents with bottled water and/or filtration systems in Charlton and MassDEP is providing bottled water to certain residents in Sturbridge.

Plaintiffs allege that the presence of elevated concentrations of the pollutants fournd in the Landfill's groundwater monitoring wells and the Wetlands, together with the groundwater flow analyses performed by Defendants' consultants, demonstrate that Landfill cells are adding these pollutants to Wetlands A, Z. Plaintiffs further allege facts that show the presence of these same pollutants in the Landfill's groundwater monitoring wells demonstrate that the Landfill is the source of this contamination and that the pollutants are leaching from Landfill cells into

groundwater and entering bedrock fractures that then convey the pollutants to the Sturbridge and Charlton residential wells.

Since 1996, WRI/SRDP has played a direct role in managing and funding the Landfill's operations and pollution control activities. Its operational role includes the management and disposal of solid waste, groundwater well installation and monitoring, maintenance and operation of a leachate collection system, and provision of services incidental to pollution control. Since purchasing WRI in 2003, Casella has played a direct role alongside SRDP in managing and funding the Landfill's operations and pollution control activities. Its operational role includes direct management of the Landfill's groundwater monitoring work. WRI/SRDP designed, permitted, constructed and completed Phases IV-VII with State-approved designs, including leachate collection systems, synthetic liners and monitoring systems.

On April 24, 2017, the Towns of Southbridge and Charlton, and MassDEP entered into an Administrative Consent Order ("Waterline ACO"). The Waterline ACO is the result of MassDEP's enforcement authority under M.G.L. c. 111, §§ 150A and 150A1/2 (Solid Waste Disposal Facilities); M.G.L. c. 21E and the Massachusetts Contingency Plan (310 CMR 40.0000); and M.G.L. 111, § 160 (Examination of Water Supply). Under the Waterline ACO, the Town and Defendants entered into a binding agreement to address the well contamination that is the subject of the Amended Complaint. The $10 million waterline will connect affected residents in Charlton to Southbridge's public water system. On May 9, 2014, MassDEP issued a Unilateral Administrative Order ("UAO") related to a soil stockpile at the Landfill that became unstable and fell into the banks of a stream in Charlton damaging adjacent wetlands. MassDEP subsequently filed suit in the Suffolk Superior Court entering into a Consent Judgment with

Casella/SRDP with a $200,000 civil penalty and payment of $20,000 for water testing equipment for the Town of Charlton.

In December 2016, MassDEP and SRDP entered into an Administrative Consent Order with Penalty ("December 2016 ACOP") for SRDP's alleged violation of solid waste, wetlands and air pollution control regulations at the Landfill, including the alleged discharge of leachate to groundwater. SRDP agreed to address the issues identified by MassDEP. MassDEP assessed a penalty against SRDP of $91,831.70, $24,331.70 of which will be paid to the Commonwealth. The remaining monies were directed to fund a Supplemental Environmental Project on the Quinebaug River. On August 3, 2017, Casella/SRDP informed the Town that it planned to cease operation of the Landfill in 2018 and proceed to "cap and close" the Landfill. On October 31, 2017, MassDEP made a formal demand to Defendants in connection with the closure of the Landfill:

> [R]equiring assessment of the full nature and extent of contamination emanating from the Landfill pursuant to 310 CMR 19.132(2)(k). The assessment should include an Initial Site Assessment ("ISA"), Comprehensive Site Assessment ("CSA"), and a Correction Action Alternative Analysis ("CAAA") under 310 CMR 19.150, in order to develop a Corrective Action Design ("CAD"). MassDEP anticipated that the CAD would include potential remedial actions at the Landfill.

In May 2017, SRDP entered into a binding commitment with MassDEP, set forth in an Administrative Consent Order ("2017 Consent Order"), to fund $5 million towards a $10 million waterline to service homes in the vicinity of the Landfill with a municipal water supply.

### Standard of Review

On a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim that is

plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. 1955 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations and original alterations omitted). "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernàndez v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011).

The same plausibility principles that govern a motion to dismiss pursuant to Rule 12(b)(6) apply with equal force to the evaluation of the Court's subject matter jurisdiction pursuant to Rule 12(b)(1). *26 Crown Associates, LLC v. Greater New Haven Regl. Water Pollution Control Auth.,* 2017 WL 2960506, at *4 (D. Conn. July 11, 2017)

*The Clean Water Act (Navigable Waters, Point Source, NPDES)*

The Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA" or "the Act"), was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The elimination of the discharge of pollutants into navigable waters is the CWA's primary focus. 33 U.S.C. § 1251(a)(1)-(7). As such, the CWA renders unlawful "the discharge of any pollutant by any person," except under specific circumstances. 33 U.S.C. § 1311(a).

Under the CWA, "pollution" is defined as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19). A "discharge of a pollutant" is broadly defined to include, *inter alia*, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). A "point source" includes "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

Section 309(g)(6)(A)(ii) of the CWA bars citizen suits seeking civil penalties when the state has commenced and is diligently prosecuting an action under state law comparable to § 309(g)(6)(A). 33 U.S.C. § 1319(g)(6)(A)(ii). Subsection (iii) bars such claims when the state has issued a final order not subject to further judicial review and the violator has paid a penalty under § 309, or comparable state law. 33 U.S.C. § 1319(g)(6)(A)(iii).

Plaintiffs must allege sufficient facts to support their claim that Defendants are "(1) discharg[ing] (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005). The Supreme Court has considered the extent to which tributaries to interstate waters are considered "navigable waters" to which the CWA applies. *Rapanos v. United States*, 547 U.S. 715 (U.S. 2006). Under the *Rapanos* plurality's test, "relatively permanent, standing or flowing bodies of water" which are tributary to interstate waters are "waters of the United States," whereas "ordinarily dry channels through which water occasionally or intermittently flows" are not, irrespective of their contribution to interstate waters. *Id*. at 732-33. In a concurring opinion,

Justice Kennedy established an alternative formulation, whereby waters must possess a significant nexus with the "chemical, physical, and biological integrity" of navigable-in-fact waters to fall under CWA jurisdiction. *Id*. at 780. (Kennedy, J., concurring). The First Circuit has held that either of these two tests may be employed to establish CWA jurisdiction. *United States v. Johnson*, 467 F.3d 56, 64 (1st Cir. 2006).

Here, Plaintiffs allege that the pollutants released by the Landfill travel through hydrologically connected groundwater before reaching the Wetlands and the drinking water aquifers and ultimately, residential wells, and that forms the basis for CWA jurisdiction. The First Circuit has not addressed whether a discharge of a pollutant that moves through ground water before reaching navigable waters may constitute a discharge of a pollutant, within the meaning of the CWA. Because, as discussed below, a landfill is not a point source within the meaning of the CWA, this Court will not reach the issue of whether the CWA extends liability to surface water that is polluted via hydrologically connected groundwater. Two recent Sixth Circuit Court cases have determined that the CWA does not extend liability to pollution that reaches surface waters via groundwater, either under a point source theory or like the Plaintiffs' try to assert here, the hydrological connection theory.[3]

---

[3] In Kentucky Waterways, the Sixth Circuit upheld the district court's dismissal of Clean Water Act ("CWA") claims brought by two plaintiff groups regarding coal ash stored in two man-made ponds, and separately reversed dismissal of plaintiffs' RCRA claims. As to the CWA claims, the Court unambiguously held that "[t]he CWA does not extend liability to pollution that reaches surface waters via groundwater." Id. at *1.

The Court went on to explain that the plaintiff groups in the case, and the few other Circuit Courts that had ruled in favor of hydrologically connected groundwater, had not correctly followed the text, purpose and legislative history of the CWA.

> First, they argue that groundwater is a point source that deposits pollutants into Herrington Lake. This theory treats groundwater as if it were a pipe through which pollutants travel. Plaintiffs also argue that the karst terrain that carries the groundwater is a point source in that it amounts to a network of conduits through which pollutants flow. We refer to this theory as the "point source" theory.

> Next, Plaintiffs adopt the so-called "hydrological connection" theory. Under this approach, groundwater is not considered a point source, but rather a medium through which pollutants pass before being discharged

Recently, the Fourth Circuit provided detailed guidance in finding that a landfill and settling pond did not constitute point sources as that term is defined under the CWA. *See Sierra Club v. Virginia Electric et al*, 2018 WL 4343513, *1 (4th Cir. 2018).[4] The Court focused on the language of the CWA itself, that defines a point source as a "discernable, confined and discrete conveyance," finding that "the landfill and ponds were not created to convey anything and did not function in that manner … Indeed, the actual means of conveyance of the arsenic was the rainwater and groundwater flowing diffusely through the soil … Thus, the landfill and settling ponds could not be characterized as discrete 'points,' nor did they function as conveyances." *Id*. at *6. The Court focused on the meaning of terms "conveyance" and "convey," which it held that a landfill does not, nor was it intended to do. "Regardless of whether a source is a pond or some other type of container, the source must still be functioning as a conveyance of the pollutant into navigable waters to qualify as a point source. In this case, the diffuse seepage of water through the ponds into the soil and groundwater does not make the pond a conveyance any more than it makes the landfill or soil generally a conveyance." *Id*. at *7. The Court went on to hold that the Act's definition makes clear that some facility must be involved that functions as a discrete, not generalized, "conveyance." *Id*. at *5.

---

into navigable waters. The point sources under this theory, as Plaintiffs argue, are the coal ash ponds themselves.

We reject both theories; the CWA does not extend its reach to this form of pollution. The text and statutory context of the CWA make that clear. In so holding, we disagree with the decisions from our sister circuits in Upstate Forever v. Kinder Morgan Energy Partners, L.P., 887 F.3d 637 (4th Cir. 2018), and Hawai'i Wildlife Fund v. Cty. of Maui, 886 F.3d 737 (9th Cir. 2018).

*See Kentucky Waterways Alliance v. Kentucky Utilities Co*., No. 18-5115, 2018 WL 4559315 at *5 (6th Cir. 2018). See also, *Tennessee Clean Water Network v. Tennessee Valley Authority*, 2018 WL 4559103 (6th 2018) (companion case to Kentucky Waterways, holding coal ash pond not a point source and hydrologically connected groundwater not basis for CWA jurisdiction).

[4] Both recent aforementioned Sixth Circuit cases, *Kentucky Waterways* and *Tennessee Clean Water,* favorably referred to the *Sierra Club* Court's holding that coal ash ponds and landfills were not point sources under the CWA.

Following *Sierra Club*'s guidance, I find that the Landfill here is not a point source under the terms of the CWA. Plaintiffs' basis for jurisdiction under the CWA stems from contaminants that allegedly flow from the Landfill, either to the Wetland or the Charlton or Sturbridge Aquifers. "[T]hat simple, causal link does not fulfill the Clean Water Act's requirement that the discharge be *from a point source*." *Sierra Club,* 2018 WL 4343513 at *5 (emphasis in original), "that is, a discrete, not generalized, conveyance." *Id*.

*Resource Conservation and Recovery Act*

Defendants argue that there is no imminent or substantial "endangerment" to support a claim under the Resource Conservation and Recovery Act. In the alternative, they contend, given the extensive remedial efforts already undertaken and committed to be taken, there is no "necessary" additional action for the Court to consider. Plaintiffs contend that the MassDEP has not taken enforcement actions to address the CWA violations in this suit and that continuing releases of certain substances from the Landfill present a "reasonable prospect of serious potential harm to individuals who rely on these aquifers for their water supply."

The RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251 (1996). The Act distinguishes between hazardous and nonhazardous solid waste, and although hazardous waste facilities are subject to direct federal oversight, the nonhazardous waste facilities, such as those created to store coal ash, remain "primarily the function of State, regional, and local agencies" with the "financial and technical assistance and leadership" of federal authorities. 42 U.S.C. § 6901(a)(4). Hence, RCRA anticipates that federal, state, and local governments will work cooperatively to ensure the safe and environmentally appropriate management of solid waste, and the statute's objectives expressly include

establishment of "a viable Federal-State partnership" to "promote the protection of health and the environment and to conserve valuable material and energy resources." *Id.* § 6902(a)(7), (a); *see AES Puerto Rico, L.P. v. Trujillo-Panisse*, 857 F.3d 101, 103 (1st Cir. 2017)

MassDEP has undertaken several enforcement actions related to the Landfill, including enforcement directly related to the alleged discharge of contaminants to groundwater – the central issue in the Amended Complaint. MassDEP's enforcement includes: the May 2014 UAO, resulting the filing of a Complaint in Superior Court and a Consent Judgment; the December 2016 Administrative Consent Order With Penalty ("ACOP"); and the April 2017 Administrative Consent Order (the "Waterline ACO;" id. at Exhibit A). MassDEP acted pursuant to its authority under comparable state laws comparable to the CWA. Most importantly, the Waterline ACO was for the express purpose of addressing the alleged contamination to groundwater. Further, in anticipation of the closure of the Landfill, MassDEP has ordered Defendants to perform an assessment of the "full nature and extent of contamination emanating from the Landfill" including an Initial Site Assessment, a Comprehensive Site Assessment, and a Correction Action Alternative Analysis. Together, MassDEP's orders, along with its ongoing oversight of the closure of the Landfill, create a comprehensive enforcement scheme, comparable to any federal CWA enforcement, to address alleged groundwater pollution from the Landfill, adjacent wetlands and private water systems.

The focus here is on whether corrective action is already taken and is being diligently pursued on the issue of pollutants leaching out of the landfill and potentially into wetlands and aquifers, and based on the record, I find that MassDEP is already action to correct those violations. Accordingly, any additional action by this Court would be duplicative and unnecessary. *See Scituate*, 949 F.2d at 555-556.

*State Law Claims*

Having disposed of the federal questions in the case, the Court must determine whether to exercise supplemental jurisdiction over the remaining state-law claims. "The district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3); *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010). The decision "is a 'pragmatic and case-specific' one" that is committed to the district court's discretion; the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012) (quoting *Roche v. John Hancokc Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Having concluded that Plaintiffs' federal claims must be dismissed, I will decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

## Conclusion

For the reasons set forth above, Defendants Casella and SRDP's Motion for Summary Judgment (Docket No. 44) and the Town of Southbridge's Motion for Summary Judgment (Docket No. 46) is **granted as to Counts I and II**. Defendants' Leave to File Notice of Supplemental Authority (Docket No. 72) is **denied** as moot and this case is **remanded** to the Worcester Superior Court, Department of the Trial Court of Massachusetts.


SO ORDERED.


*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**